# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

ABDUL BROWN                 )
                                    )    Civil Action No. 07 - 637
                                      )
Plaintiff,                      )
                                      )    Magistrate Judge Lisa Pupo Lenihan
            v.                    )
                                      )
JEFFREY BEARD; WILLIAM       )
STICKMAN; FRED MAUE; LANCE    )
COUTURIER; DONALD WILLIAMSON; )
MIKE ZAKEN; HARRY WILSON;      )
GEORGE REPOSKY; ADAM CRUMB;   )
SCOTT NICKELSON; CHARLES       )
DOBRZYNSKI; ROBERT HOLMAN;    )
LEE JOHNSON; JOHN MEEKER;      )
CORRECTIONAL OFFICER          )
CUMMINGS; KEN KETCHER,       )
                                      )

Defendants.

## MEMORANDUM ORDER

Plaintiff, Abdul Brown, a Pennsylvania prisoner, commenced this action on May 14, 2007 pursuant to the Civil Rights Act of 1871, 42 U.S.C. § 1983 complaining about the conditions of his confinement in the Special Management Unit (SMU) in the State Correctional Institution at Fayette (SCI-Fayette). Plaintiff alleges a variety of Eighth Amendment claims and challenges his placement and confinement in the SMU pursuant to the Fourteenth Amendment, arguing that he was placed there without due process and in violation of his equal protection rights. Further, Plaintiff contends that his placement in the SMU is predicated upon a retaliatory animus born of his history of grievances and litigation against the DOC. In addition, Plaintiff alleges that several defendants used excessive force against him in the course of a cell extraction that occurred on December 12, 2005. Plaintiff also claims that, in retaliation for a grievance he

filed on February 6, 2006, several defendants began spreading a rumor that he was a "snitch," which resulted in verbal harassment from other inmates. Brown further alleged that Defendants denied him food in retaliation for previous lawsuits. Brown sought declaratory, injunctive and monetary relief.

On July 23, 2008, following discovery, Defendants filed a motion for summary judgment (ECF No. 63). The Court then ordered Plaintiff to file his response to the motion by September 5, 2008. On July 30, 2008, Plaintiff filed a motion to extend that deadline because he had been transferred from his state facility to a federal facility without his legal materials. The District Court granted his motion and extended the deadline for a response until November 5, 2008. After that deadline passed, Plaintiff filed a motion for a further extension, alleging that he had been transferred from the federal facility back to his state facility without the legal materials that had been forwarded to him at the federal facility. Plaintiff's Motion was granted and he was given until January 30, 2009 to file his response (ECF No. 75).

On January 21, 2009, nine days before his response was due, Brown filed an affidavit pursuant to Fed. R. Civ. P. 56(f) (ECF No. 76) and a motion for the appointment of counsel (ECF No. 77). In the affidavit, Brown asserted that he could support his claims with affidavits by fellow prisoners who since had been transferred out of the SMU but that DOC policy forbade him from corresponding with them. He also asserted that Defendants had refused to produce his psychological evaluations and information regarding his transfer to SMU (in particular, the petition setting forth the reasons for the transfer). The District Court did not specifically address Brown's Rule 56(f) affidavit but on January 22, 2009, it ordered Defendants to respond to the motion for appointment of counsel as follows.

Plaintiff has filed another request for appointment of counsel. Although prior requests were denied, this request centers on his ability to receive documents that he believes are necessary in order to prosecute his case, *i.e.*, documents regarding his mental health history, his transfer petition and relevant procedure manuals. Defendants are ORDERED to respond to this motion no later than 2/5/09 with an explanation of what was requested by Plaintiff and what responses were provided by Defendants, whether Defendants believe these documents to be relevant to Plaintiff's case and, if so, how this issue could be remedied short of appointment of counsel if that is possible.

On February 6, 2009, Defendants filed their Response (ECF No. 80) wherein they acknowledged that they had refused, on confidentiality grounds, to produce Brown's psychiatric evaluations and certain information regarding his transfer to SMU. They agreed, however, to produce a redacted version of the SMU transfer petition. The record does not disclose whether they ever did so. On February 9, 2009, the Court denied Brown's motion for counsel.

Following review of Defendants' Response to Plaintiff's motion, the Court agrees that his mental health records are not relevant to Plaintiff's claims and providing that information to him places his mental health counselors in jeopardy, and may also negatively impact his mental health treatment. He has been provided with significant information regarding his confinement to the SMU and will be able to adequately respond to any summary judgment motion. Should this case survive summary judgment and proceed to trial, the Court will revisit Plaintiff's request for the appointment of counsel.

On February 24, 2009, the parties consented to the jurisdiction of a magistrate judge (ECF No. 85). On March 10, 2009, the Defendants' motion for summary judgment was granted (ECF No. 87).

On May 12, 2009, Plaintiff filed a Motion for Status of Case (ECF No. 88) requesting a copy of the docket entries. On May 19, 2009, he filed a Brief in Opposition *nunc pro tunc* to Defendants' Motion for Summary Judgment (ECF No. 89), which contained several exhibits.

On May 22, 2009, he filed a Motion to Alter or Amend the Judgment (ECF No. 92) wherein he asserted that he had never received a copy of the summary judgment order. He also argued that he had not filed a response to the pending motion for summary judgment because he believed that his Rule 56(f) affidavit put summary judgment on hold. The only substantive relief he requested in his motion was for the District Court to consider his *nunc pro tunc* opposition to defendants' summary judgment motion. On May 23, 2009, the Court entered the following text order.

> The Motion for Summary Judgment at issue was filed in July 2008. Plaintiff was ordered to respond by Sept. 5, 2008. Two extensions were requested and granted and Plaintiff's response was finally due on 1/30/09. No response was ever received and the summary judgment motion was ruled upon on March 9, 2009. At this late date Plaintiff is asking to be able to communicate with other prisoners and for the judgment to be altered. Plaintiff had 8 months to file a response. He blatantly disregarded numerous court orders to do so. He was advised that if he did not respond the motion would be ruled upon. At this late date, with no explanation for the long delay, the Court sees no reason to reopen this case. The clerk is ordered to provide Plaintiff with a copy of the Order and Judgment filed on 3/9/09, although a copy was previously sent to Plaintiff at his address of record by the Court.

On May 29, 2009, Plaintiff file a timely appeal from this order (ECF No. 94).

On March 22, 2010, the Court of Appeals for the Third Circuit issued its non-precedential opinion regarding Brown's appeal (ECF No. 104). In that Opinion, the Court of Appeals directed this Court to grant Plaintiff's Rule 60(b) motion, consider his opposition brief, and conduct such other proceedings as may be required.

On June 16, 2010, pro bono counsel was appointed for Plaintiff. He requested, and was granted, time to conduct discovery. Following the close of discovery he was ordered to file a

response to Defendants' Motion for Summary Judgment.  Plaintiff, through counsel, now has filed a response and the motion for summary judgment is ripe for review by this Court.

### A. Standard of Review

Presently pending is Defendants' Motion for Summary Judgment (ECF No. 63). Summary judgment is appropriate if, drawing all inferences in favor of the non-moving party, the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law.  Fed. Rule Civ. Proc. 56(c).  Summary judgment may be granted against a party who fails to adduce facts sufficient to establish the existence of any element essential to that party's case, and for which that party will bear the burden of proof at trial. Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986) (party can move for summary judgment by "pointing out to the district court that there is an absence of evidence to support the non-moving party's case.").  The moving party bears the initial burden of identifying evidence that demonstrates the absence of a genuine issue of material fact.  Once that burden has been met, the non-moving party must set forth ". . . specific facts showing that there is a genuine issue for trial . . ." or the factual record will be taken as presented by the moving party and judgment will be entered as a matter of law.  Matsushita Elec. Ind. Co. v. Zenith Radio Corp., 475 U.S. 574 (1986).  An issue is genuine only if the evidence is such that a reasonable jury could return a verdict for the non-moving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986).  The inquiry, then, involves determining " 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.' "  Plaintiff v. Grabowski, 922 F.2d 1097, 1111 (3d Cir. 1990), *cert. denied*, 501 U.S. 1218 (1991) (quoting Anderson, 477 U.S. at 251-52).  If a court concludes that "the

evidence is merely colorable . . . or is not significantly probative," then summary judgment may be granted. Anderson, 477 U.S. at 249-50.

## B. Undisputed Material Facts

On December 28, 2006, Plaintiff was placed in a restricted housing unit known as the Special Management Unit (SMU) at the State Correctional Institution at Fayette, Pennsylvania. Prior to his transfer, he was confined in the Long Term Segregation Unit (LTSU), which was discontinued in February of 2007. The conditions of confinement in the LTSU was discussed by the United States Supreme Court in Banks v. Beard, 548 U.S. 521 (2006) as follows.

> The LTSU is the most restrictive of the three special units that Pennsylvania maintains for difficult prisoners. The first such unit, the "Restricted Housing Unit," is designed for prisoners who are under disciplinary sanction or who are assigned to administrative segregation. The second such unit, the "Special Management Unit," is intended for prisoners who "exhibit behavior that is continually disruptive, violent, dangerous or a threat to the orderly operation of their assigned facility." The third such unit, the LTSU, is reserved for the Commonwealth's "most incorrigible, recalcitrant inmates."

> LTSU inmates number about 40. Most, but not all, have "flunked out" of the SMU program. To qualify, they must have met one or more of the following conditions: failure to "complete" the SMU program; "assaultive behavior with the intent to cause death or serious bodily injury"; causing injury to other inmates or staff; "engaging in facility disturbance(s)"; belonging to an unauthorized organization or "Security Threat Group"; engaging in criminal activity that "threatens the community"; possessing while in prison "weapons" or "implements of escape"; or having a history of "serious" escape attempts, "exerting negative influence in facility activities," or being a "sexual predator." The LTSU is divided into two levels. All inmates are initially assigned to the most restrictive level, level 2. After 90 days, depending upon an inmate's behavior, an individual may graduate to the less restrictive level 1, although in practice most do not.

The RHU, SMU, and LTSU all seriously restrict inmates'
ordinary prison privileges. At all three units, residents are
typically confined to cells for 23 hours a day, have limited access
to the commissary or outside visitors, and (with the exception of
some phases of the SMU) may not watch television or listen to
the radio.

Banks, 548 U.S. at 525-526 (internal citations omitted).

A prisoner confined in restricted housing in Pennsylvania is reviewed weekly by his/her

counselor and every thirty days by the Unit Management Team.[1] These reviews are documented

in the DC-14, Cumulative Adjustment Record. Prisoners are reviewed by the Program Review

Committee (PRC)[2] every ninety days. The PRC's decision to continue the inmate in AC status

or release him/her to population is documented on a DC-141, Part 4 with a copy provided to the

inmate. A qualified psychologist or psychiatrist conducts an interview and assessment of

inmates remaining in AC status for more than 30 calendar days. Thereafter, a mental health

assessment is completed at least every 90 calendar days. When an inmate is being recommended

for transfer to a Special Housing Unit (SMU, SSNU) the PRC reviews the recommendation with

_____

1. The Unit Management Team consists of the individuals assigned to operate a housing unit
with the responsibilities for security, risk management, conducting informal resolutions of
misconducts, and program delivery. DC-ADM 802, Administrative Custody Procedures Manual
Glossary of Terms.

2    The Program Review Committee is a committee consisting of three staff members who
conduct Administrative and Disciplinary Custody Hearings, periodic reviews, make decisions
regarding continued confinement in a Security Level 5 Housing Unit, and hear all first level
appeals of misconducts. The committee shall consist of a Deputy Superintendent (who shall
serve as the chairperson), a Commissioned Officer, and one staff member from the following
classifications: Corrections Classification and Program Manager (CCPM), Unit Manager, School
Principal, Alcohol and Other Drugs Treatment Specialist Supervisor or Inmate Records Office
Supervisor. The Facility Manager may designate other staff as committee members; however, if
such designations are made, they must be in writing and the Facility Manager must maintain a
list of all designees. Whenever a PRC is convened, at least one member of the committee must
be a staff member who is not directly involved in the administration of the Security Level 5
Housing Unit in which the inmate is currently housed. DC-ADM 802, Administrative Custody
Procedures Manual Glossary of Terms.

the inmate and inform him/her of the reason(s) for the transfer recommendation. The inmate is given the opportunity to respond to the rationale given and object to his/her placement in a Special Housing Unit, if he/she so desires. The inmate may appeal the recommendation for Special Housing Unit transfer to the Facility Manager/designee and Central office.

Plaintiff was transferred to the SMU predominantly based on his failure to adjust to prison life as documented in his lengthy misconduct history. Specifically, since he entered the jurisdiction of the DOC in August 1998 through December 28, 2006, Plaintiff had incurred a total of 128 misconducts (ECF No. 63-2). Of these, Plaintiff was charged fourteen times for Assault, 24 times with Possession of Contraband, 36 times with Refusing to Obey an Order, and twice for Arson.

The PRC review dated December 28, 2006, sets forth the following as the basis for Plaintiff's transfer to the SMU.

<u>Initial Reason for Confinement</u>

Inmate Brown was received from SCI-Greene's RHU on 2/26/04 and placed in the LTSU (A645202) according to DC-ADM 802, Article IV, Section A, Subsection 1.a. He arrived here from SCI-Greene with Disciplinary Custody [DC] time expiring 02/23/1 3. He will be placed on LTSU Level 4 for 90 days at which time his level will be determined by the Unit Management Team. Inmate level changed to Level 3 on 5/20/04. On 11/03/04 he RECD 30 days DC (A61 5086) for#33, and #35. On 01/24/05 he RECD 20 days DC (A708901) for #33. On 02/18/05 he RECD a consec.45 days DC (A708918) for #38, a consec. 45 days DC (A70891 9) for #38, and a consec. 150 days DC (426358) for #1, #15, #33. On 03/21/05 he RECD a consec. 45 days DC (A71 7919) for #38, a consec. 45 days DC (437113) for #38, and a consec. 150 days DC (A671104) for #1, #15. On 04/05/05 he RECD 30 days concurrent (A671169) for #35. On 04/25/05 he RECD a consec. 90 days DC (A671 154) for #36, and a concurrent 30 days DC (A671158) for #36, #51. On 05/09/05 he RECD a consec. 60 days DC (A671177) for #36. On 08/30/05 he RECD a consec. 60 days DC (A61 51 56) for #36. On 09/26/05

he RECD a consec. 90 days DC (A705385) for #1, #35. On 10/17/05 he RECD a consec. 90 days DC (A68781 3) for #36, a consec. 60 days DC (A687823) for #33, #35, and a consec. 45 days DC (A687817) for #38. On 11/07/05 he RECD a consec. 60 days DC (A687830) for#15. On 12/20/05 he RECD a consec. 60 days DC (A717964) for #36, #38, a consec. 90 days DC (A717966) for #35, #38, a consec. 90 days DC (A717968) for #1, and a consec. 75 days DC (A756943) for #33, #35. On 03/03/06 he RECD a consec. 30 days DC (A687872) for #33, #35. On 03/22/06 he RECD 30 days DC (A570204) for #35, #41. On 03/31/06 he RECD a consec. 60 days DC (A754396) for #15, #33, a consec. 60 days DC (A767936) for #15, #35, a consec. 20 days DC (A767938) for #35, a consec. 30 days DC (A767943) for #33, #35, and a consec. 20 days DC (A767936) for #33. On 04/10/06 he RECD a consec. 30 days DC (A744354) for #15, #33, and a consec. 60 days DC (A756603) for #15, #33. On 04/12/06 he RECD a consec. 90 days DC (A612941) for #17, #40. On 05/30/06 he RECD a consec. 75 days DC (A756661) for #36, and a consec. 60 days DC (A756642) for #15, #33, #35. On 06/05/06 he was ATA to SCI-Graterford. On 10/25/06 he returned to SCI-Fayette. On 11/29/06 he RECd a consec. 45 days DC (A90861 9) for #31, #36.

PRC Comments

Inmate Brown refused to attend his SMU placement hearing. He had an opportunity to agree/object with his placement into the SMU but refused. He is being placed in the SMU during the LTSU transition. His next regularly scheduled review will be held on 02/15/07.

ECF No. 63-1, p. 23.

Plaintiff challenged his placement in the SMU by filing grievance no. 174565 (ECF No. 63-1, p. 24). The response to this grievance provides as follows.

COMPLAINT: Inmate Brown is alleging that his placement in the SMU is unlawful due to the following reasons: He was not evaluated prior to placement, He was not afforded due process prior to placement, the SMU placement decision was based on the 6.5.1 policy, which hasn't been properly promulgated and thus null and void, mentally ill inmates are prohibited by law and DOC policy from being housed in the SMU, he has been denied twice previously for the SMU due to Brown having behavioral

instability and periodic exacerbations of his chronic adjustment disorder issues and severe borderline personality disorder. Inmate Brown is seeking to be immediately removed from the SMU, mentally assessed and compensated in the amount of $500,000.

FINDING OF FACT: The Executive Deputy Secretary reviewed your transfer petition and approved your placement in the SMU. Your behavior, to include misconducts, DC time, disruptive incidents, etc, and your current psychological evaluation were reviewed, which means that a thorough evaluation was completed prior to your placement in the SMU. You were afforded due process by attending your PRC hearing and being informed of the reasoning for your placement, which you then had the opportunity to respond to the rationale and object, if appropriate. Regarding your contention that the 6.5.1 is null and void, that is incorrect. The Policy was reviewed/approved by Dr. Jeffrey Beard, Secretary of Corrections. To address your two mental illness issues, the Chief Psychiatrist/Psychologist reviewed your current psychological evaluation and approved your placement in the SMU.

DECISION: This grievance is without merit.

ECF No. 63-1, p. 25.

Plaintiff appealed this decision to Superintendent Harry Wilson claiming that he was not given any prior notice of why he was being called for his PRC hearing on an irregular date, *i.e.*, not the date he usually was assigned and that he did not get a copy of his DC-141 part 4. The Superintendent denied this appeal as follows.

After a careful evaluation of the attached grievance, it is the determination of this Superintendent that the action and response provided by the investigating staff will be upheld. I find the issues raised at the first-level appeal were addressed appropriately and responsibly by staff at the initial review.

I find no argument of merit enclosed in your appeal; your placement in the SMU Program is not unlawful. Department policy 6.5.1 stipulates that you receive reason for your placement in the SMU Program. You did, you received a DC-141 Part III documenting that your placement was a result of the LTSU Program transitioning into an SMU Program, your behavior to

include misconducts, DC-Time, disruptive incidents, etc. and your current psychological evaluation was reviewed. The Executive Deputy Secretary reviewed and approved your transfer petition and approved your placement into the SMU Program. This was also explained to you at your PRC hearing on December 28, 2006, during which you had the opportunity to question the Committee regarding your aforementioned placement, however you refused to attend.

In conclusion, to address your two mental health issues, the Chief Psychiatrist/Psychologist reviewed your current psychological evaluation and approved your placement in the SMU Program as well. There is no merit to your accusations, Department policy was followed in regards to the procedures in your SMU placement your request to be compensated and appeal is denied.

ECF No. 63-1, p. 28.

Plaintiff filed a final appeal, which was denied as follows.

Dear Mr. Brown:

This is to acknowledge receipt of your appeal to final review of the above numbered grievance.

In accordance with the provisions of DC-ADM 804, effective January 3, 2005, 1 have reviewed the entire record of this grievance; including your initial grievance, the grievance officer's response, your appeal from initial review and the superintendent's response. I have also carefully reviewed the issues you raise to final review. Upon completion of this review, it is the decision of this office to uphold the responses provided by staff at the institutional level. There is no evidence to support your claim that your placement in the SMU is unlawful. Your placement in the SMU was reviewed by the appropriate Department of Correction's (DOC) staff and was determined to be appropriate based on a number of factors. Your request to be removed from the SMU and compensated in the amount of $500.000.00 is unwarranted and, therefore, denied.

The responses provided at the institutional level are appropriate and in accordance with Department of Corrections' policies and procedures. Accordingly, your appeal to final review must be denied.

On December 12, 2005, Plaintiff smashed his cell door windows and ripped a metal plate off the wall inside his cell. Plaintiff was also observed threatening to assault staff with a mixture of urine and feces which he intended to throw out of his cell. In response to this situation, defendant Reposkey assembled a cell extraction team and reported to Plaintiff's cell. In addition to the notes of the ensuing exchange, which defendant Reposky prepared immediately thereafter, the cell extraction was videotaped[3] by a non-defendant corrections officer commencing with the assembly of the extraction team, which the court has now reviewed for a second time. In briefing the cell extraction team, defendant Reposky stated that Plaintiff had been medically cleared for the use of Oleoresin Capsicum (O.C.) (essentially mace or pepper spray), as well as the EBID. The extraction team was accompanied by two nurses – one of whom was defendant Ketcher – for the purposes of ensuring Plaintiff's continued well-being during the extraction. Defendant Reposky and the extraction team approached Plaintiff's cell, whereupon they discovered that Plaintiff had covered the window in the door with a towel. After Plaintiff refused several direct orders to remove the towel and submit himself to be handcuffed, defendant Reposky administered a two-second burst of O.C. through the food aperture in Plaintiff's cell door. Plaintiff threw the aforementioned mixture of urine and feces at defendant Reposky as he opened the food aperture. This initial dose of O.C. appears to have had no effect on Plaintiff, who can be heard speaking clearly – even shouting – at the officers even after its application. After being convinced to dispose of a second cup of urine and feces mixture, Plaintiff voluntarily submitted himself to be handcuffed and was removed from the cell without further incident.

---

3. The cell extraction was videotaped pursuant to DOC policy (Exhibit 8).

Plaintiff was thereafter placed in a holding cell area so that the requisite strip search could be performed. At this time, Plaintiff was laughing and taunting the Corrections Officers and threatening "y'all gonna pay for this." After he refused several direct orders regarding the search, O.C. was used for a second time by defendant Reposky. Once the strip search was completed, Plaintiff's eyes were washed by Nurse Ketcher. Plaintiff then was placed in a restraint chair and secured. Once Plaintiff was secure therein, his eyes were once again washed by Nurse Ketcher and the restraints were checked. Upon his complaints of shortness of breath, Nurse Ketcher administered Plaintiff's inhaler. Defendant Johnson placed the EBID shield on the ground to assist with securing Plaintiff in the restraint chair. Officer Haines – who is not a defendant in this case –used the hand-held EBID on Plaintiff when he began resisting the application of the restraints. Plaintiff was placed in the restraint chair at approximate 10:30 a.m. and was removed at approximately 6:30 p.m.

### C. Liability under 42 U.S.C. § 1983

Plaintiff's Complaint seeks to assert liability against Defendants pursuant to 42 U.S.C. § 1983. To state a claim under 42 U.S.C. § 1983, a plaintiff must meet two threshold requirements. He must allege: 1) that the alleged misconduct was committed by a person acting under color of state law; and 2) that as a result, he was deprived of rights, privileges, or immunities secured by the Constitution or laws of the United States. West v. Atkins, 487 U.S. 42 (1988); Parratt v. Taylor, 451 U.S. 527, 535 (1981), *overruled in part on other grounds*, Daniels v. Williams, 474 U.S. 327, 330-331 (1986).

To establish personal liability against a defendant in a section 1983 action, that defendant must have personal involvement in the alleged wrongs; liability cannot be predicated solely on the operation of *respondeat superior*. Rizzo v. Goode, 423 U.S. 362 (1976). Accordingly,

individual liability can be imposed under section 1983 only if the state actor played an "affirmative part" in the alleged misconduct. Rode v. Dellarciprete, 845 F.2d 1195, 1207 (3d Cir. 1988); Chinchello v. Fenton, 805 F.2d 126, 133 (3d Cir. 1986). Personal involvement by a defendant can be shown by alleging either personal direction or actual knowledge and acquiescence in a subordinate's actions. Rode, 845 F.2d at 1207.

The issues at bar concern whether Defendants have violated any of Plaintiff's constitutional rights. His claims are discussed separately below.

### D. First Amendment - Retaliation

Plaintiff claims that Defendants retaliated against him by placing him in the SMU, denying him food and by labeling him a snitch. It is well settled that retaliation for the exercise of a constitutionally protected right may violate the protections of the First Amendment, which is actionable under section 1983. Rauser v. Horn, 241 F.3d 330 (3d Cir. 2001); White v. Napoleon, 897 F.2d 103, 112 (3d Cir. 1990). However, merely alleging the fact of retaliation is insufficient; in order to prevail on a retaliation claim, a plaintiff must show three things: (1) the conduct which led to the alleged retaliation was constitutionally protected; (2) that he was subjected to adverse actions by a state actor (here, the prison officials); and (3) the protected activity was a substantial motivating factor in the state actor's decision to take the adverse action. See Mt. Healthy City Bd. of Educ. v. Doyle, 429 U.S. 274, 287 (1977); Anderson v. Davila, 125 F.3d 148, 163 (3d Cir. 1997).

A plaintiff can satisfy the second requirement by demonstrating that the "adverse" action "was sufficient to deter a person of ordinary firmness from exercising his [constitutional] rights." See Allah v. Seiverling, 229 F.3d 220, 225 (3d Cir. 2000). The third factor, "motivation," may be established by alleging a chronology of events from which retaliation plausibly may be

inferred.  <u>Tighe v. Wall</u>, 100 F.3d 41, 42 (5th Cir. 1996); <u>Goff v. Burton</u>, 91 F.3d 1188 (8th Cir. 1996); <u>Pride v. Peters</u>, 72 F.3d 132 (Table), 1995 WL 746190 (7th Cir. 1995).  If the plaintiff proves these three elements, the burden shifts to the state actor to prove that it would have taken the same action without the unconstitutional factors.  <u>Mt. Healthy</u>, 429 U.S. at 287.  "This means that, once a prisoner demonstrates that his exercise of a constitutional right was a substantial or motivating factor in the challenged decision, the prison officials may still prevail by proving that they would have made the same decision absent the protected conduct for reasons reasonably related to a legitimate penological interest." <u>Rauser</u>, 241 F.3d at 334.

Because retaliation claims can be easily fabricated, district courts must view prisoners' retaliation claims with sufficient skepticism to avoid becoming entangled in every disciplinary action taken against a prisoner.  *See* <u>Cochran v. Morris</u>, 73 F.3d 1310, 1317 (4th Cir. 1996); <u>Woods v. Smith</u>, 60 F.3d 1161, 1166 (5th Cir. 1995), *cert. denied*, 516 U.S. 1084 (1996); <u>Colon v. Coughlin</u>, 58 F.3d 865, 873 (2d Cir. 1995).  Finally, allegations of *de minimis* acts of retaliation do not state a claim under § 1983.  <u>Thaddeus-X v. Blatter</u>, 175 F.3d 378, 397 (6th Cir. 1999); <u>Dawes v. Walker</u>, 239 F.3d 489, 492 (2d Cir. 2001) (holding that a *de minimis* retaliatory act is outside the ambit of constitutional protection).

A prisoner's ability to file grievances and lawsuits against prison officials is a protected activity for purposes of a retaliation claim.  *See* <u>Milhouse v. Carlson</u>, 652 F.2d 371, 373-74 (3d Cir. 1981) (retaliation for exercising right to petition for redress of grievances states a cause of action for damages arising under the constitution); <u>Woods</u>, 60 F.3d at 1165 (prison officials may not retaliate against an inmate for complaining about a guard's misconduct).  Plaintiff claims that the retaliation was the result of his filing grievances and complaints.  Thus, he has alleged the first element of a retaliation claim.

With respect to the second element, the Plaintiff alleges that he was placed in the SMU, denied food trays and was labeled a snitch. Only retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights constitutes an adverse action for a claim of retaliation. This objective inquiry is not static across contexts; it must be tailored to the different circumstances in which retaliation claims arise. Thaddeus-X v. Blatter, 175 F.3d 378, 398 (6th Cir. 1999) ("Prisoners may be required to tolerate more than public employees, who may be required to tolerate more than average citizens, before a [retaliatory] action taken against them is considered adverse.").

With regard to his first two allegations, this Court may conclude that Plaintiff has alleged the second element of a retaliation claim, *i.e.*, that he was subjected to "adverse" action. *See* Mitchell v. Horn, 318 F.3d 523, 530 (3d Cir. 2002) (holding that prisoner's allegation that he was falsely charged with misconduct in retaliation for filing complaints against a correctional officer sufficiently alleged a retaliation claim); Allah v. Seiverling, 229 F.3d 220, 225 (3d Cir. 2000) (holding that an allegation that a prisoner was kept in administrative segregation to punish him for filing civil rights complaints stated a retaliation claim).

It is unclear, however, whether Plaintiff's third allegation that he was labeled a snitch, can satisfy the second element of a retaliation claim. *See* Dawes v. Walker, 239 F.3d 489, 492 (2d Cir. 2001) ("Absent some factual showing that the comments by the prison officials actually risked inciting other inmates against Dawes, we are unwilling simply to assume that prison inmates would be incited, without more, to attack "one of their own" who was labeled an "informant" and a "rat" for complaining to prison supervisors about a prison guard's conduct."); McDowell v. Sherrer, 2008 WL 4542475, *22 (D.N.J. 2008) (same); Snyder v. McGinnis, 2004

WL 1949472 (W.D.N.Y. Sept. 4, 2004). The Court need not decide this issue, however, as Plaintiff's has not shown the third factor required to make out a retaliation claim.

In this regard, the third element of a retaliation claim requires the Plaintiff to show that the protected activity was a substantial motivating factor in the state actor's decision to take the adverse action. This "motivation" factor may be established by alleging a chronology of events from which retaliation plausibly may be inferred. Tighe v. Wall, 100 F.3d 41, 42 (5th Cir. 1996); Goff v. Burton, 91 F.3d 1188 (8th Cir. 1996); Pride v. Peters, 72 F.3d 132 (Table), 1995 WL 746190 (7th Cir. 1995). It is Plaintiff's burden to prove that the Defendants were motivated by retaliation. Hannon v. Speck, 1988 WL 131367, at *4 (E. D. Pa. Dec. 6, 1988) ("In bringing a § 1983 action alleging such retaliation, an inmate faces a substantial burden in attempting to prove that the actual motivating factor ... was as he alleged.") (internal quotes and citation omitted), aff'd, 888 F.2d 1380 (3d Cir. 1989) (Table).

With respect to his first retaliation claim, i.e., that he was placed in the SMU, the record evidence does not establish the essential third element, i.e., that the protected activity was a substantial motivating factor in the state actor's decision to take the adverse action. In this regard, DOC records indicate that Plaintiff was placed in the SMU due to his disruptive behavior and extensive and violent misconduct history (ECF. No. 63-1, 63-3). Plaintiff has not submitted any evidence to refute this. Because this demonstrates that the state actors would have taken the same action without the unconstitutional factors, Plaintiff can not prevail on his first retaliation claim and Defendants are entitled to summary judgment as to this claim.

In his second claim, Plaintiff alleges that he was denied food trays by Defendants Holman and Cummings (Compl. ¶ 44). Plaintiff does not attach any evidence to support this claim and does not provide any information as to when this allegedly occurred. Nor has Plaintiff submitted

any evidence indicating when Defendants Holman and Cummings allegedly became aware of his prior litigation or his filing of grievances such as to establish any motivating  In this regard, Plaintiff has failed to provide the court with any probative evidence establishing the crucial link between his previous litigation and Defendants alleged retaliatory actions.  *See* Lauren W. ex rel. Jean W. v. Deflaminis, 480 F.3d 259, 267 (3d Cir. 2007) (to show a causal connection, a plaintiff must prove "either (1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action, or (2) a pattern of antagonism coupled with timing to establish a causal link"); Estate of Smith v. Marasco, 318 F.3d 497, 512 (3d Cir. 2003) (holding that the temporal proximity between the protected conduct and the alleged retaliatory action must be "unusually suggestive" before the court will infer a causal link) (citing Krouse v. Am. Sterilizer Co., 126 F.3d 494, 503 (3d Cir. 1997)).

Brown is quite aware that it is his responsibility to come forward with evidence in support of his claims in response to defendants' motion for summary judgment.  *See* Brown v. Pennsylvania Dept. of Corrections  290 Fed. App'x 463, 466 (3d Cir. 2008).  Here, Plaintiff has failed to provide a precise chronology of events; consequently, no reasonable jury could infer causation.  While "timing plus other evidence may be an appropriate test where the temporal proximity is not so close as to be 'unduly suggestive,' " Farrell v. Planters Lifesavers Co., 206 F.3d 271, 280 (3d Cir. 2000), Plaintiff has not offered other evidence in support of his retaliation claim.  Thus, he has not demonstrated any causation between his protected activities and Defendants' alleged actions in refusing him meal trays.[4]

---

1. It is patently clear that not every allegedly adverse action is sufficient to support a claim of retaliation.  *See, e.g.*, Huskey v. City of San Jose, 204 F.3d 893, 899 (9th Cir. 2000) (holding that a retaliation claim cannot rest on the logical fallacy of *post hoc, ergo propter hoc*, literally, "after this, therefore because of this.").

Moreover, Defendants have attached records showing that Plaintiff repeatedly refused his meal trays (ECF No. 63-3, pp. 35-36). Plaintiff has not submitted any evidence to refute the accuracy of these records. Thus, Defendants are entitled to summary judgment as to Plaintiff's second retaliation claim.

With regard to his third claim, in his Complaint, he states that he was labeled a snitch for filing the February 6, 2006 Grievance No. 143257. Yet, in that Grievance, he complains that Holman, Meeker, Dobrynski and Crumb labeled him a snitch and wrote the word snitch on his property box. The affidavits he filed in support of this claim show that the alleged name calling was done prior to the filing of his grievance. *See* ECF No. 89-5, p. 2; ECF No. 89-6, p. 2. Because he allegedly was labeled a snitch **before** he filed this grievance, Plaintiff can not show that the protected activity of filing the grievance on February 6, 2006 was the substantial motivating factor in the state actor's decision to take the adverse action. Consequently, Defendants are entitled to summary judgment as to this claim.

### E. The Eighth Amendment

Plaintiff makes several allegations that invoke liability under the Eighth Amendment, which provides as follows.

> Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted.

U.S. Const. amend. VIII.

The Eighth Amendment protects individuals against the infliction of "cruel and unusual punishments." U.S. Const. amend. VIII. This protection, enforced against the states through the Fourteenth Amendment, guarantees incarcerated persons humane conditions of confinement. In this regard, prison officials must ensure that inmates receive adequate food, clothing, shelter

and medical care, and must "take reasonable measures to guarantee the safety of the inmates." Farmer v. Brennan, 511 U.S. 825, 832 (1994) (quoting Hudson v. Palmer, 468 U.S. 517, 526-27 (1984)).

Notwithstanding, not every injury raises constitutional concerns. A prison official violates the Eighth Amendment only when two requirements are met. The inmate must show that: 1) he suffered a risk of "serious" harm; and 2) prison officials showed "deliberate indifference" to such risk. *Id.*, 511 U.S. at 834. The first element is satisfied when the alleged "punishment" is "objectively sufficiently serious." *Id*. In determining whether a prisoner has alleged a risk that is objectively serious, a court must consider not only the seriousness of the potential harm and the likelihood that the harm will actually occur, but evidence that unwilling exposure to that risk violates contemporary standards of decency. In other words, the prisoner must show that the risk of which he complains is not one that today's society chooses to tolerate. Helling v. McKinney, 509 U.S. 25, 35 (1993). The second criterion, deliberate indifference, requires an inmate to show that the prison official had a sufficiently culpable state of mind.

The Supreme Court clarified this deliberate indifference standard in Farmer as follows.

> We hold instead that a prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference. This approach comports best with the text of the Amendment as our cases have interpreted it. The Eighth Amendment does not outlaw cruel and unusual "conditions"; it outlaws cruel and unusual "punishments." An act or omission unaccompanied by knowledge of a significant risk of harm might well be something society wishes to discourage, and if harm does result society might well wish to assure compensation. . . . But an official's failure to alleviate a significant risk that he should have

> perceived but did not, while no cause for commendation, cannot
> under our cases be condemned as the infliction of punishment.

Farmer, 511 U.S. at 837-838 (emphasis added).

## 1. Conditions of Confinement

Plaintiff first alleges that the conditions of his confinement in the SMU violated the Eighth Amendment prohibition against cruel and unusual punishment. Plaintiff fails to allege any facts to demonstrate that the conditions of his confinement in the SMU deprived him of any basic human need such as food, clothing, shelter, sanitation, medical care or personal safety. Neither classification nor confinement to segregation, either administrative or punitive, implicates the Cruel and Unusual Punishment Clause of the Eighth Amendment unless the conditions themselves are cruel and unusual. Hutto v. Finney, 437 U.S. 678, 686 (1978); Spaight v. Coughlin, 104 F.3d 350 (Table), 1996 WL 518507 (2d Cir. 1996), cert. denied, 117 S.Ct. 972 (1997); Young v. Quinlan, 960 F.2d 351, 363 (3d Cir. 1992); Sheley v. Dugger, 833 F.2d 1420, 1428-29 (11th Cir. 1987); Gibson v. Lynch, 652 F.2d 348, 352 (3d Cir. 1981) ("administrative segregation and solitary confinement do not, in and of themselves, constitute cruel and unusual punishment") (citing Hutto), cert. denied, 462 U.S. 1137 (1983).

The Constitution does not mandate comfortable prisons. Rhodes, 452 U.S. at 349. Prisons housing "persons convicted of serious crimes cannot be free of discomfort." Id. Accord Griffin v. Vaughn, 112 F.3d. 703 (3d Cir. 1997) (restrictive conditions in administrative custody in the Pennsylvania state correctional institutions, in and of themselves, do not violate the Eighth Amendment).

Plaintiff claims that the SMU is a severely hostile environment and that Defendants have confined him there in order to conduct psychiatric research and that his confinement in the SMU

is exacerbating his mental illness. As stated, the SMU is a place where the worst of the worst are confined. Plaintiff has submitted no evidence to support his claims that Defendants are conducting psychiatric research as part of the LTSU and/or SMU programs. The behavior modification utilized in these programs is a carrot and stick approach, *i.e.*, Plaintiff's negative behaviors are negatively reinforced or "punished" by a substantial loss of privileges and Plaintiff is encouraged to engage in good behavior by the incentive of granting greater privileges as he continues to engage in positive behaviors. Such behavior modification appears throughout the penal system, *i.e.*, the stick of incarceration at a greater security classification and/or higher security prison with the carrot of greater privileges in lower security prisons or the carrot of parole should the inmate conduct himself properly.

The well-established rule is that discipline reasonably maintained in state prisons is not under the supervisory direction of Federal courts. <u>Ford v. Board of Managers of the New Jersey State Prison</u>, 407 F.2d 937 (3d Cir. 1969).

> But so long as incarceration as a form of punishment continues, we are required perforce to recognize that, archaic and indefensible though it may be, its objective is to circumscribe certain activities and opportunities not only available in, but also characteristic of, an open societal setting. And, unpleasant as it is to contemplate the physical restrictions of a 'settled environment', we must also recognize that even those rights which survive penal confinement may be diluted by peculiar institutional requirements of discipline, safety, and security.

<u>Gittlemacker v. Prasse</u>, 428 F.2d 1, 3-4 (3 Cir. 1970).

It is only when confinement becomes so foul, so inhuman, and so violative of the basic concepts of decency that a federal court should interfere with prison officials who purportedly have the experience and expertise in matters of prison discipline. Plaintiff has failed to evidence conditions that satisfy the objective component of an Eighth Amendment claim with respect to

the conditions alleged in the SMU. Consequently, Defendants are entitled to summary judgment as to this claim. *Accord* <u>Dantzler v. Beard</u> 2007 WL 5018184, *10 (W.D.Pa. Dec. 6, 2007); <u>Woods v. Abrams</u>, 2007 WL 2852525, 13 (W.D.Pa. Sept. 27, 2007); <u>Elliott v. Beard</u>, 2006 WL 4404771, *5 (W.D.Pa. Sep 27, 2006).

## 2. <u>Denial of Food</u>

Plaintiff claims that Defendants denied him his meal trays in violation of the Eighth Amendment. While the Eighth Amendment requires prison officials to provide adequate nutrition to convicted prisoner, only extreme deprivations state a violation of the Eighth Amendment. <u>Hudson v. McMillan</u>, 503 U.S. 1, 8-9 (1992). The conditions presenting the risk must be "sure or very likely to cause serious illness and needless suffering," and give rise to "sufficiently imminent dangers." <u>Helling v. McKinney</u>, 509 U.S. 25, 33, 34-35 (1993). In order to prevail on such a claim there must be a "substantial risk of serious harm," an "objectively intolerable risk of harm" that prevents prison officials from pleading that they were "subjectively blameless for purposes of the Eighth Amendment." <u>Farmer v. Brennan</u>, 511 U.S. 825, 842, 846, and n. 9 (1994).

Here, Plaintiff does not provide any evidence concerning when, or how often, these alleged sporadic denials occurred. Inasmuch as Plaintiff does not presently contend that he was denied consecutive meals, nor that he suffered any ill effects from these supposed occasional denials, Defendants are entitled to summary judgment as to this claim. *Cf.* <u>Ford v. Brd. of Mgrs of New Jersey State Prison</u>, 407 F.2d 937, 939-940 (3d Cir. 1969) (no Eighth Amendment claim where prisoner fed four slices of bread and one pint of water three times a day with a full meal every three days).

## 3. <u>Excessive Force</u>

Next, Plaintiff alleges that Defendants used excessive force during a cell extraction that occurred on December 12, 2005. The Cruel and Unusual Punishments Clause of the Eighth Amendment protects inmates against the application of excessive force by correctional officers. *See* Whitley v. Albers, 475 U.S. 312, 318-19 (1986). What is required to prove an Eighth Amendment violation "varies according to the nature of the alleged constitutional violation." Hudson v. McMillian, 503 U.S. 1, 5 (1992). In an excessive force claim, the core judicial inquiry is "whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." Hudson v. McMillian, 503 U.S. 1, 7 (1992). Factors relevant to this inquiry include: the need for application of force; the relationship between that need and the amount of force used; the threat reasonably perceived by the responsible officials; and any efforts made to temper the severity of a forceful response. Hudson, 503 U.S. at 7 (citations omitted). The extent of any resulting injury, while material to the question of damages and informative as to the likely degree of force applied, is not in and of itself a threshold requirement for proving this type of Eighth Amendment claim. Wilkins v. Gaddy, ___ U.S. ___, 130 S.Ct. 1175 (2010).

The facts surrounding the cell extraction are set forth on pages 12 and 13 herein.

The fact that prison authorities employ the use of restraint chairs, body restraints or taser guns does not, in and of itself, allege a violation of the Eighth Amendment. *See, e.g.*, Fuentes v. Wagner 206 F.3d 335, 345 (3d Cir. 2000) (defendants entitled to summary judgment with regard to use of restraint chair where there was no evidence that prison officials placed him in the chair maliciously and sadistically to cause harm); Dixon v. Toole, 225 Fed. App'x 797, 799 (11th Cir. 2007) (no Eighth Amendment violation with respect to four point restraints where prisoner suffered no physical injury); Parks v. Williams 157 Fed. App'x 5, 6 (9th Cir. 2005)

(same); <u>Draper v. Reynolds</u>, 369 F.3d 1270, 1278 (11th Cir. 2004) (holding that a "single use of the taser gun causing a one-time shocking" against a "hostile, belligerent, and uncooperative" arrestee in order to effectuate the arrest was not excessive force in the totality of the circumstances); <u>Jasper v. Thalacker</u>, 999 F.2d 353, 354 (8th Cir. 1993) (using stun gun to subdue an unruly inmate did not violate Eighth Amendment where plaintiff failed to prove that the officers used the stun gun "sadistically or maliciously" to cause harm); <u>Caldwell v. Moore</u>, 968 F.2d 595, 602 (6th Cir. 1992) (use of stun gun against disruptive prisoner to restore discipline and order does not violate Eighth Amendment); <u>Michenfelder v. Sumner</u>, 860 F.2d 328, 336 (9th Cir. 1988) (policy of allowing use of taser guns on inmate who refuses to submit to a strip search does not constitute cruel and unusual punishment). Prisons are hostile environments, the use of restraint chairs and the like may be the only way for prison officials to control prisoners such as Brown who simply will not abide by the prisons rules. As long as such measures are utilized in an humane manner, it is not for the federal courts to interfere in prison discipline.

With respect to the event depicted on the videotape, it is clear that the force applied was not so excessive as to present a cognizable Eighth Amendment claim. Plaintiff's actions in destroying his cell created the confrontation; force was applied for reasonably short periods necessary to subdue Plaintiff. Contrary to Plaintiff's assertions, the use of the stun gun and chemical agent does not prove that the amount of force was excessive. <u>Soto v. Dickey</u>, 744 F.2d 1260, 1270 (7th Cir. 1984) ("The use of mace, tear gas or other chemical agent of the like nature when reasonably necessary ... to subdue recalcitrant prisoners does not constitute cruel and inhuman punishment," even if the inmate is handcuffed). Moreover, the brief application of the EBID was reasonably necessary to control Plaintiff while he was being strapped into the restraint chair. *See* <u>Hunter v. Young</u>, 238 Fed. App'x 336, 339 (10th Cir. 2007) (finding use of taser gun

not objectively unreasonable); Jeffers v. Gomez, 267 F.3d 895, 910-11 (9th Cir. 2001) (a prison security measure that is undertaken for the protection of prison officials and the inmate population is constitutional when it is applied in good-faith). Consequently, Defendants are entitled to summary judgment as to the force used up until the time he was secured in the restraint chair as demonstrated on the videotape.

Plaintiff also alleges that, during the time period not depicted on the videotape, he was shocked with the EBID by Defendant Johnson after he was restrained and incapable of being a threat to anyone. This allegation may support a claim of excessive force. *See, e.g.*, McDowell v. Sheerer, 374 Fed. App'x 288 (3d Cir. 2010; Smith v. Mensinger, 293 F.3d 641, 648 (3d Cir. 2002); Brooks v. Kyler, 204 F.3d 102 (3d Cir. 2000). Thus, this claim remains assuming Plaintiff can demonstrate that he fully exhausted this claim as required by the PLRA.

### 4. Failure to Provide Medical Treatment

Plaintiff also asserts an Eighth Amendment claim alleging failure to provide medical treatment for his mental illness. He claims that his disruptive behavior is due to his mental condition, bi-polar disorder and low Global Assessment Function of 55, and that his confinement in the SMU is exacerbating his mental illness. To state an Eighth Amendment violation in the context of medical treatment, an inmate must show prove two elements: 1) plaintiff was suffering from a "serious medical need," and 2) prison officials were deliberately indifferent to the serious medical need. Gamble v. Estelle, 439 U.S. 897 (1978).

The first showing requires the court to objectively determine whether the medical need was "sufficiently serious." A medical need is "serious" if it is one that has been diagnosed by a physician as mandating treatment, or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention. Gaudreault v. Municipality of Salem, 923 F.2d

203, 208 (1st Cir. 1990), *cert. denied*, 500 U.S. 956 (1991); <u>Monmouth County Correctional Institutional Inmates v. Lanzaro</u>, 834 F.2d 326, 347 (3d Cir. 1987), *cert. denied*, 486 U.S. 1006 (1988).

The second prong requires a court <u>subjectively</u> to determine whether the officials acted with a sufficiently culpable state of mind. Deliberate indifference may be manifested by an intentional refusal to provide care, delayed medical treatment for non-medical reasons, a denial of prescribed medical treatment, or a denial of reasonable requests for treatment that results in suffering or risk of injury. <u>Durmer v. O'Carroll</u>, 991 F.2d 64, 68 (3d Cir. 1993).

a.      Serious Medical Need

In the case at bar, the Plaintiff claims that he did not receive adequate medical care for his mental health illness. A plaintiff alleging constitutionally inadequate medical treatment must submit medical evidence of a "serious medical need" sufficient to satisfy the objective component of the test. <u>Boring v. Kozakiewicz</u>, 833 F.2d 468 (3d Cir. 1987), *cert. denied*, 485 U.S. 991 (1988). In <u>Boring</u>, the Court of Appeals for the Third Circuit determined that, because plaintiffs failed to produce expert testimony that their injuries were "serious," they failed to meet their burden of proof. The court explained that expert testimony would not necessarily be required in situations where the seriousness of injury or illness would be apparent to a lay person, *e.g.*, a gunshot wound. <u>Boring</u>, 833 F. 2d at 473 (citing <u>City of Revere v. Massachusetts General Hosp.</u>, 463 U.S. 239 (1983)). With respect to an ulnar nerve injury and migraine headaches, however, the Court concluded that a fact finder would not be able to determine that the condition was "serious" because the need for treatment did not appear to be "acute." *Id*. With respect to a scalp condition and complaints about dental care, the Court found that the complaints merely reflected a disagreement over the proper method of treatment. In so concluding, the Court noted

that "courts will not 'second-guess the propriety or adequacy of a particular course of treatment [which] remains a question of sound professional judgment.'" *Id*. (quoting <u>Inmates of Allegheny County Jail v. Pierce</u>, 612 F.2d 754, 762 (3d Cir. 1979)). Finally, with respect to a prior knee injury, the Court found that the evidence did not establish an acute condition.

> As laymen, the jury would not be in a position to decide whether any of the conditions described by plaintiffs could be classified as "serious." In these circumstances, the district court properly required expert medical opinion and in its absence properly withdrew the issue from the jury.

<u>Boring</u>, 833 F.2d at 474 (citations omitted).

Here, Plaintiff has not included any evidence to whatsoever to substantiate the existence of any serious medical need with regard to his alleged mental illness. Moreover, as Defendants point out, the record evidence belies his contentions in this regard. Plaintiff has received regular examinations and reviews by the mental health staff. During each of these reviews, a Mental Health Contact Note is created by the Psychological/Psychiatric Support Staff (PSS) member (ECF No. 63-3, pp. 24-36). Plaintiff's Mental Health Contact Notes provide that he is psychologically stable. These notes further provide that Plaintiff has attempted to manipulate a psychological recommendation to leave the LTSU and that he "oscillates between wanting to be mentally ill and not wanting to be mentally ill," and "does not play the mentally ill game well" (ECF No. 63-3, p. 30).

As with the medical complaints in <u>Boring</u>, a lay person would not be able to conclude that Plaintiff's unsubstantiated allegations of mental illness constituted a "serious medical need" sufficient to invoke the Gamble standard without expert testimony or evidence. Thus, Plaintiff has failed to meet his burden of demonstrating a genuine issue of fact about whether Defendants ignored a critical or escalating medical situation or that their actions posed a substantial risk of

serious harm. Because evidence of this nature is required in order for an inmate's claim to succeed, Plaintiff's failure to meet this burden is fatal to his case.

## b. Deliberate Indifference

Moreover, even if the court were to conclude that Plaintiff has demonstrated the existence of a serious medical need, a finding this Court specifically does not make, he has failed to demonstrate that Defendants were deliberately indifferent to it. The "deliberate indifference" standard for purposes of liability under section 1983 is a stringent standard of fault requiring proof that a defendant disregarded a known or obvious consequence of his action. Board of County Commissioners of Bryan County v. Plaintiff, 520 U.S. 397, 410 (1997). The defendant must be both aware of facts from which the inference could be drawn that a substantial harm exists and he must also draw the inference. Farmer v. Brennan, 511 U.S. 825, 837 (1994). An official is not deliberately indifferent if "he fails to alleviate a significant risk that he should have identified." *Id*. Moreover, deliberate indifference to a serious medical need of a prisoner is distinguishable from a negligent diagnosis or treatment of a medical condition; only the former conduct violates the Eighth Amendment. Medical malpractice may give rise to a tort claim in state court but does not necessarily rise to the level of a federal constitutional violation. Kost v. Kozakiewicz, 1 F.3d 176, 185 (3d Cir. 1993); Durmer v. O'Carroll, 991 F.2d 64, 67 (3d Cir. 1993).

The Supreme Court explained the difference between negligence and constitutional claims in Estelle v. Gamble, 429 U.S. 97, 104 (1978). In that case, the prisoner, Gamble, was injured when a bale of cotton fell on him while he was unloading a truck. He went to the unit hospital where a medical assistant checked him for a hernia and sent him back to his cell. He returned to the hospital where he was given pain pills by an inmate nurse and then was examined

by a doctor. The following day, his injury was diagnosed as a lower back strain; he was prescribed a pain reliever and a muscle relaxant. Over the course of several weeks, Gamble was seen by several doctors who prescribed various pain relievers and provided him with medical work excuses. Ultimately, despite his protests that his back hurt as much as it had the first day, medical staff certified Gamble to be capable of light work. During the next two months, Gamble received a urinalysis, blood test, blood pressure measurement, and pain and blood pressure medication. Subsequently, a medical assistant examined Gamble and ordered him hospitalized for treatment of irregular cardiac rhythm.

The Supreme Court held that Gamble's allegations failed to state a claim upon which relief could be granted against the defendant, both in his capacity as a treating physician and as the medical director of the Corrections Department.

> Gamble was seen by medical personnel on 17 occasions spanning a 3-month period . . .. They treated his back injury, high blood pressure, and heart problems. Gamble has disclaimed any objection to the treatment provided for his high blood pressure and his heart problem; his complaint is "based solely on the lack of diagnosis and inadequate treatment of his back injury." The doctors diagnosed his injury as a lower back strain and treated it with bed rest, muscle relaxants and pain relievers. Respondent contends that more should have been done by way of diagnosis and treatment, and suggests a number of options that were not pursued. The Court of Appeals agreed, stating: "Certainly an x-ray of (Gamble's) lower back might have been in order and other tests conducted that would have led to appropriate diagnosis and treatment for the daily pain and suffering he was experiencing." But the question whether an X-ray or additional diagnostic techniques or forms of treatment is indicated is a classic example of a matter for medical judgment. A medical decision not to order an X-ray, or like measures, does not represent cruel and unusual punishment. At most it is medical malpractice, and as such the proper forum is the state court under the Texas Tort Claims Act.

Gamble, 427 U.S. at 107 (internal citations omitted).

Plaintiff's allegations, like Gamble's, do not state a constitutional violation, a prerequisite for recovery under 42 U.S.C. § 1983. The record evidence reveals that the Defendants acted responsibly in attending to his medical needs. He was seen by psychiatric staff on a monthly basis and was determined to be stable. While an intentional refusal to provide any medical treatment to an inmate suffering from a serious medical need manifests deliberate indifference and is actionable under the Eighth Amendment, the Eighth Amendment does not require that a prisoner receive every medical treatment that he requests or that is available elsewhere. A disagreement as to the appropriate choice of medical treatment does not give rise to a constitutional violation because the "right to be free from cruel and unusual punishment does not include the right to the treatment of one's choice." Layne v. Vinzant, 657 F.2d 468, 473 (1st Cir. 1981). Mere disagreements over medical judgment do not state Eighth Amendment claims as there are typically several acceptable ways to treat an illness. Young v. Quinlan, 960 F.2d 351, 358 n.18 (3d Cir. 1992); White v. Napoleon, 897 F.2d 103, 110 (3d Cir. 1990).

Taken as true, the Plaintiff's allegations and the record evidence simply do not show that Defendants acted with deliberate indifference to his serious medical needs for purposes of imposing liability under the Eighth Amendment's prohibition against cruel and unusual punishment. Specifically, there is nothing that suggests that Defendants knew that Plaintiff faced a substantial risk of serious harm and disregarded that risk by failing to take reasonable measures to abate it. Thus, the Defendants are entitled to judgment as a matter of law with respect to this claim. *See* Brown v. Pennsylvania Dept. of Corrections 290 Fed. App'x 463, 467 (3d Cir. 2008) ("The record establishes that Brown has not been deprived of medical care in the LTSU"); Sides v. Law 283 Fed. App'x 930 (3d Cir. June 30, 2008) (corrections officials' failure to afford mental health treatment to an inmate while he was housed in a special management unit (SMU)

31

did not constitute deliberate indifference to his medical needs, so as to violate the Eighth Amendment, even though he had an anti-social personality disorder).

In paragraph 45 of his Complaint, Plaintiff claims that Nurse Ketcher should not have approved the use of OC due to his asthmatic condition. First of all, it was Dr. Harper, not Nurse Ketcher, who approved the use of OC. As Dr. Harper is not a Defendant in this action, there is no basis to impose liability for the approval of the OC. Second, Plaintiff's eyes were washed out twice and his inhaler administered despite the fact that he did not appear to suffer any respiratory ill effects from the OC. Thus, there is no basis to conclude that either the approval or the use of the OC violated Plaintiff's Eighth Amendment rights.

## F. Fourteenth Amendment

### 1. Procedural Due Process

Plaintiff claims that Defendants' actions in placing him in the SMU and/or LTSU violated his rights under the Due Process Clause of the Fourteenth Amendment because he was not provided with notice or a hearing. The Due Process Clause does not protect every change in the conditions of confinement having a substantial adverse impact on a prisoner. Meachum v. Fano, 427 U.S. 215, 224 (1976). The Due Process Clause shields from arbitrary or capricious deprivation only those facets of a convicted criminal's existence that qualify as "liberty interests." Hewitt v. Helms, 459 U.S. 460 (1983); Morrissey v. Brewer, 408 U.S. 471 (1972). The types of protected liberty interests are not unlimited. The interest must rise to more than an abstract need or desire and must be based on more than a unilateral hope. Rather, an individual claiming a protected interest must have a legitimate claim of entitlement to it. Greenholtz v. Inmates of Nebraska Penal and Correctional Complex, 442 U.S. 1, 7 (1979) (citation omitted).

Thus, the threshold question presented by Petitioner's claim is whether Defendants' actions impacted a constitutionally-protected liberty interest. A liberty interest may arise either from the Due Process Clause itself, or from a statute, rule, or regulation. <u>Hewitt</u>, 459 U.S. at 466.

### a. Liberty Interest Inherent in Due Process Clause

A liberty interest inherent in the Constitution arises when a prisoner has acquired a substantial, although conditional, freedom such that the loss of liberty entailed by its revocation is a serious deprivation requiring that the prisoner be accorded due process. <u>Gagnon v. Scarpelli</u>, 411 U.S. 778, 781 (1973). Interests recognized by the Supreme Court that fall within this category include the revocation of parole, <u>Morrissey</u>, 408 U.S. at 471, and the revocation of probation, <u>Gagnon</u>, 411 U.S. at 778. The Due Process Clause, however, does not create an inherent liberty interest to remain free from administrative segregation. *See, e.g.*, <u>Hewitt</u>, 459 U.S. at 468; <u>Wolff</u>, 418 U.S. at 556; <u>Montayne v. Haymes</u>, 427 U.S. 236, 242 (1976); <u>Sheehan v. Beyer</u>, 51 F.3d 1170, 1175 (3d Cir. 1995); <u>Layton v. Beyer</u>, 953 F.2d 839, 845 (3d Cir. 1992). Accordingly, Plaintiff can succeed under the Due Process Clause only if state law or regulation has created a constitutionally-protected liberty interest in remaining free from administrative detention.

### b. Liberty Interest Created by Law or Statute

In <u>Sandin v. Conner</u>, 515 U.S. 472 (1995) the Supreme Court dramatically narrowed the range of liberty interests created by law and regulation. Prior to <u>Sandin</u>, courts reviewed the specific language of the pertinent law or regulation to determine whether the language was unmistakably mandatory in character such that it created a liberty interest. The Supreme Court announced a new rule in Sandin for determining whether a prisoner had a protected liberty

33

interest created under statute or regulation by shifting the focus of inquiry from the specific language of the law or regulation to whether the deprivation suffered by the prisoner imposes an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." Sandin, 515 U.S. at 483 (emphasis added).

Every court that has addressed this issue in Pennsylvania has determined that prisoners do not have a liberty interest in remaining free from confinement in the SMU or similar housing. See, e.g., Smith v. Dodrill, 2009 WL 62175 (M.D. Pa. Jan 8, 2009); Spencer v. Kelchner, 2007 WL 88084 (M.D. Pa. Jan. 9, 2007); Dantzler v. Beard 2007 WL 5018184 (W.D. Pa. Dec. 6, 2007); Francis v. Dodrill, 2005 WL 2216582 (M.D. Pa. Sept.12, 2005). Cf. Johnson v. Hill, 910 F.Supp. 218, 220 (E. D. Pa. 1996) (holding that, absent a state-created liberty interest that does not exist in Pennsylvania, prisoner placement is a matter of prison administration and a prisoner has no constitutional right to be placed in any particular cell or housing unit).

Notwithstanding, long-term confinement in restricted housing may be sufficiently atypical and significant to create a protected liberty interest. See Shoats v. Horn, 213 F.3d 140 (3d Cir. 2000). Here, Plaintiff has been confined in restricted housing since at least 2004. Thus, the Court concedes that he has demonstrated a protected liberty interest. However, it is well settled in Pennsylvania that periodic review of inmates indefinitely confined in administrative confinement comports with due process requirements. Shoats 213 F.3d at 144; Delker v. McCullough, 103 Fed. App'x 694 (3d Cir. 2004); McKeithan v. Beard, 322 Fed. App'x 194, 199 (3d Cir. 2009) (holding that prisoner's due process claim failed because he received periodic reviews while in the LTSU); Brown v. Pa. Dep't of Corrections, 290 Fed. App'x 463, 465-66 (3d Cir. 2008) (same); Dantzler v. Beard, Civ. No. 05-1727, 2008 WL 744740, at *1 (W. D. Pa. Mar. 18, 2008) (same for LTSU and SMU). The Court of Appeals for the Third Circuit

repeatedly has affirmed the holding in Shoats that post-transfer periodic review comports with due process requirements for prisoners serving lengthy sentences who are housed in restrictive administrative custody for indefinite periods of time. *See, e.g.*, Gans v. Rozum, 267 Fed. App'x 178, 180-81 (3d Cir. 2008) (prisoner in administrative custody status for eleven years ); Williams v. Sebek, 299 Fed. App'x 104, 107 (3d Cir. 2008) (holding that inmate's continued confinement in administrative custody for five and one-half years did not require a remedy because the record showed that he was receiving the required periodic reviews of his status by the program review committee); Brown v. D.O.C. Pa., 265 Fed. App'x 107, 110 (3d Cir. 2008) (same); Bowen v. Ryan, 248 Fed. App'x 302, 304 (3d Cir. 2007) (prisoner in administrative custody status for twenty years on restricted release status).

In the current action, Plaintiff complains about his placement in the SMU. Specifically, he states that he did not receive advance notice that his PRC review, which was scheduled for a different date than he anticipated, was for the purpose of transferring him from the LTSU to the SMU. However, Plaintiff is well aware that "due process does not require prior notice of a transfer where the post-transfer periodic review of an inmate's placement in segregation provides the inmate with a meaningful opportunity to challenge the grounds of his continued segregation." Brown, 290 Fed. App'x at 465. The record shows that Plaintiff has received reviews by the Program Review Committee (PRC) every 90 days, and by his unit team every 30 days, since at least October, 2005 (ECF No. 63-2, pp. 2-21). Moreover, Plaintiff was provided an opportunity to meet with the PRC upon notification of his transfer from the LTSU to the SMU but he refused to attend this meeting (ECF No. 63-2, p. 23). Finally, Plaintiff filed a grievance regarding his SMU placement, which was reviewed and answered at all three levels (ECF No. 63-2, pp. 24-31). He has failed to submit any valid evidence showing that such reviews did not provide him

a meaningful opportunity to challenge the grounds of his continued segregation. *See* <u>Brown v. Pennsylvania Dept. of Corrections</u>, 290 Fed. App'x at 466 ("Brown's affidavit, submitted in response to defendants' motion, does not support a conclusion that his reviews were a sham."). Accordingly, Defendants are entitled to summary judgment as to Plaintiff's procedural due process claim.

## 2. <u>Equal Protection</u>

In his Complaint, Plaintiff further asserts that he was denied equal protection. The Equal Protection Clause provides that no state shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. Amend. XIV, § 1. "This is not a command that all persons be treated alike but, rather, 'a direction that all persons similarly situated should be treated alike.' " <u>Artway v. Attorney General of State of N.J.</u>, 81 F.3d 1235, 1267 (3d Cir. 1996) (quoting <u>City of Cleburne, Tex. v. Cleburne Living Center</u>, 473 U.S. 432, 439 (1985)). *See also* <u>United States v. Armstrong</u>, 517 U.S.456 (1996) (Equal Protection Clause prohibits decision to prosecute based on an unjustifiable standard such as race, religion, or other arbitrary classification).

To demonstrate an equal protection violation, an inmate has the burden of proving the existence of purposeful discrimination. <u>Hernandez v. New York</u>, 500 U.S. 352 (1991); <u>McCleskey v. Kemp</u>, 481 U.S. 279, 292 (1987). Official action does not violate the Equal Protection Clause solely because it results in a disproportionate impact; proof of discriminatory intent or purpose is required to show a violation. <u>Village of Arlington Heights v. Metropolitan Housing Development Corp.</u>, 429 U.S. 252, 265 (1977); <u>Washington v. Davis</u>, 426 U.S. 229, 239 (1977); <u>Stehney v. Perry</u>, 101 F.3d 925, 938 (3d Cir. 1996). Discriminatory purpose implies more than intent as volition or intent as awareness of consequences. It implies that the decision maker selected a particular course of action at least in part because of, not merely in spite of, its

adverse effects upon an identifiable group. <u>Hernandez</u>, 500 U.S. at 360. An inmate must offer evidence specific to his own case that would support an inference that unlawful considerations played a part in the adverse decision. <u>McCleskey</u>, 481 U.S. at 293.

Plaintiff has failed to allege any facts from which it can be concluded that Defendants engaged in intentional or purposeful discrimination or that he was treated differently than similarly situated persons on the basis of his race, nationality or gender. In short, Plaintiff does not show any discrimination with respect to his placement in the SMU or with respect to his treatment he received there. There is no cognizable equal protection claim stated. Additionally, the Plaintiff has not stated any specific acts taken by Defendants to show any discriminatory animus attributable to Defendants. Thus, Defendants are entitled summary judgment as to this claim. *Accord* <u>Spencer v. Kelchner</u>, Civil No. 3:06-1099, 2007 WL 88084, at *13-15 (M.D. Pa. Jan. 9, 2007); <u>Dantzler v. Beard,</u> Civil No. 05-1727, 2007 WL 5018184, at *9-10 (W.D. Pa. Dec. 6, 2007).

### G. Conspiracy

In his Amended Complaint, Plaintiff makes several accusations of conspiracy. In order to demonstrate a conspiracy, "a plaintiff must show that two or more conspirators reached an agreement to deprive him or her of a constitutional right 'under color of state law.'" <u>Parkway Garage, Inc. v. City of Philadelphia</u>, 5 F.3d 685, 700 (3d Cir. 1993) (quoting <u>Adickes v. S.H. Kress & Co.</u>, 398 U.S. 144, 150 (1970)). Plaintiff has concluded that Defendants and others conspired to violate his rights yet, with regard to the claims discussed above, he has failed to evidence any facts showing an agreement or plan formulated and executed by the Defendants to achieve this conspiracy. Plaintiff cannot rely on unsupported claims of conspiracy. Without a factual showing which gives some substance to the conspiracy claims, Plaintiff's conspiracy

claim amounts to nothing more than mere conjecture and bare speculation. The law is clear that bare allegations of wrongdoing by a Defendant, without any substantiating proof of an unlawful agreement, are insufficient to sustain a conspiracy claim. Gometz v. Culwell, 850 F.2d 461, 464 (8th Cir. 1988) (citations omitted). Also, to survive a motion for summary judgment, the Plaintiff must establish that there is a genuine issue of material fact regarding the question of whether the Defendants entered into an illegal conspiracy which caused the Plaintiff to suffer a cognizable injury. Massachusetts School of Law at Andover v. American Bar Association, 107 F.3d 1026, 1039 (3d Cir.), *cert. denied*, 522 U.S. 907 (1997). In other words, to successfully counter the Defendants' motions for summary judgment, Plaintiff must provide specific evidence establishing that the Defendants agreed among themselves to act against him either unlawfully or for an unlawful purpose. Vieux v. East Bay Regional Park Dist., 906 F.2d 1330, 1343 (9th Cir.), *cert. denied*, 498 U.S. 967 (1990).

Here, Plaintiff has failed to introduce into this record any evidence which shows an agreement or plan formulated and executed by Defendants or anyone else which rises to the level of a conspiracy. At a minimum, absent some modicum of proof which tends to reveal the existence of an agreement which is designed to deny the constitutional rights of the Plaintiff, he cannot maintain his conspiracy claim. In sum, Plaintiff's allegations, standing alone, are patently insufficient for a reasonable jury to return a verdict in his favor. *See* Schowengerdt v. United States, 944 F.2d 483 (9th Cir. 1991) (allegations in a complaint which are based on inference and speculation cannot defeat a motion for summary judgment on a conspiracy claim), *cert. denied*, 503 U.S. 951 (1992); D.R., a minor v. Middle Bucks Area Vocational School, 972 F.2d 1364 (3d Cir. 1992) (the Plaintiffs failed to show that the Defendants engaged in a conspiracy to interfere with the Plaintiffs' civil rights); City of Omaha Betterment Association v. City of Omaha, 883

F.2d 650 (8th Cir. 1989) (evidence was insufficient to support a finding that an employer and a local union conspired to deny an employee a promotion because of her gender); Gometz v. Culwell, 850 F.2d at 464 (summary judgment should have been granted regarding against allegations of a conspiracy purportedly engaged in between prison officials because no credible evidence supported the conspiracy claim); Oatess v. Norris, 431 Pa. Super. 599, 637 A.2d 627 (1994) (inmate's response to officers' motion for summary judgment in 1983 civil rights action alleging a conspiracy was not sufficient to establish the existence of a genuine issue of material fact).

Because the evidence which is included in the record is insufficient to raise a genuine issue of material fact, the Defendants' Motions for Summary Judgment will be granted as to this claim as well.  An appropriate order follows.

**AND NOW**, this 21st day of March, 2011;

**IT IS HEREBY ORDERED** that Plaintiff's Motion to Alter Judgment (ECF No. 92) is **GRANTED**.

**IT IS FURTHER ORDERED** that the Order granting Defendants' Motion for Summary Judgment (ECF No.87) and Judgement in favor of Defendants (ECF No. 86) are **VACATED**.

**IT IS FURTHER ORDERED** that Defendants' Motion for Summary Judgment (ECF No. 63) is **GRANTED EXCEPT** as to Plaintiff's claim that Defendant Johnson used the EBID after he was fully restrained and incapable of being a threat.

_____
Lisa Pupo Lenihan
United States Magistrate Judge